CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 21 2006

JOHN F. CORCORAN, CLERK
BY:
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DEVON SUTHERLAND, IRA MADISON, and DEMETRICE MURRAY, Plaintiffs, | Civil Action No. 7:02-cv-00477 |
| v. | **MEMORANDUM OPINION** |
| RONALD ANGELONE, et al., Defendants. | By: Hon. James C. Turk Senior United States District Judge |

Plaintiffs Devon Sutherland, Ira W. Madison, and Demetrice Murray, are inmates in the custody of the Virginia Department of Corrections ("VDOC"), proceeding pro se in this civil action. Of the many claims raised in the original complaint,[1] the only claim remaining before the court is plaintiffs' assertion that enforcement of the VDOC's grooming policy, Departmental Operating Procedure 864 ("DOP 864"), places substantial burdens on their religious practices in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et. seq. Defendants filed a motion for summary judgment asserting that because the challenged policy furthers compelling penological interests by the least restrictive means, it does not violate plaintiffs' rights under RLUIPA. Plaintiffs responded, making the matter ripe for the court's consideration. Upon review of the record, the court concludes that the motion for

---

[1] By previous orders and opinions, the court dismissed or granted summary judgment as to plaintiffs' First Amendment claims and supplemental state law claims regarding the grooming policy, First Amendment and RLUIPA claims regarding religious diet, and other prison practices. In an order entered March 22, 2004, the court found that only plaintiffs' RLUIPA claims concerning the grooming policy and its burdens on their religious beliefs (with the exception of their dietary claims) remained before the court. Defendants thereafter filed a motion to dismiss on the ground that RLUIPA is unconstitutional as applied to state prisons. By order entered August 15, 2005, the court dismissed this motion to dismiss without prejudice and granted defendants an opportunity to file a motion for summary judgment on the merits of plaintiffs' RLUIPA claims, which they did.

1

summary judgment must be granted.

## I. Background

Section 3 of RLUIPA prohibits governments from enacting regulations, including rules of general applicability, or otherwise taking actions that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that imposition of that burden furthers "a compelling governmental interest" by "the least restrictive means." § 2000cc-1(a)(1)-(2). This strict-scrutiny standard applies any time such a burden on religious exercise occurs "in a program or activity that receives Federal financial assistance," or "affects, or removal of that substantial burden would affect," interstate or foreign commerce.[2] Id. The statute creates a private cause of action for persons who allege that a government has substantially burdened their religious conduct. § 2000cc-2(a). Plaintiff bears the burden of persuasion on whether the challenged law places a substantial burden on his exercise of religious belief; if plaintiff proves this threshold issue, the government program must prove that the imposition of the burden furthers a compelling interest by the least restrictive means. § 2000cc-2(b).

On December 15, 1999, the VDOC began enforcing DOP 864, setting forth new personal grooming standards for all inmates who are incarcerated in VDOC facilities. The policy covers hair care, hair style, beards, mustaches, fingernails and general hygiene. Defendants assert that this grooming policy, modeled after a similar policy implemented by the South Carolina Department of Corrections in August of 1997, was designed to promote safety, security, and sanitation, and to facilitate the identification of inmates. DOP 864 directs that male inmates

---

[2]In their current motion, defendants do not contest that they are not subject to RLUIPA.
2

must keep their hair no more than one inch in depth and thickness. Male inmates may not wear beards, goatees, or sideburns below the middle of the ear unless they obtain an order from medical staff exempting them from shaving. Mustaches must be neatly trimmed and may not extend beyond the corner of the mouth or over the lip. Men who get a no-shave order for medical reasons must keep their facial hair trimmed to one eighth of an inch in length or shorter. DOP 864 prohibits male inmates from wearing certain hair styles such as braids, plaits, dreadlocks, cornrows, ponytails, buns, mohawks, partially shaved heads, designs cut into the hair, or any style which could conceal contraband.

Inmates who refuse to cut their hair, beards, and/or fingernails, or to alter their hair styles to comply with the specifications of this procedure will be given an order to do so. If an inmate continues to refuse to comply, he will be charged with a violation of Major Offense Code 201, disobeying a direct order, and be placed on pre-hearing detention. If convicted, that inmate will serve an isolation sentence. If he is convicted of two more violations, he will serve two additional, longer isolation sentences and then be referred to the Institutional Classification Authority for assignment to segregation, possible reclassification to a higher security level institution, and a possible reduction in the rate at which he can earn good time or earned sentence credit. The inmate will remain assigned to segregation until the inmate fully complies with the grooming standards.

Madison states that he is a Hebrew Israelite by birth and that his family's affiliation with this faith goes back four generations. In keeping with the tenets of his religion, Madison wears his hair long and untrimmed. Murray and Sutherland both assert that they have long been sincere Rastafarians who follow Nazarite law which requires them to leave their hair uncut by a

3

razor. Because they do not cut their hair in compliance with DOP 864, all three of these inmates have been housed in segregated confinement for years, pursuant to the disciplinary aspects of the policy. In their March 2002 complaint, plaintiffs claim that segregation status substantially burdens their religious practice because it "punishes" them with the loss of opportunities they would have in the general population to: complete a G.E.D. education program; congregate, pray, worship, chant or sing, beat drums, and study with others of their religious persuasions as their beliefs require;[3] purchase religious literature and other materials; recreate with others; buy shampoo and other commissary products; make nonlegal telephone calls; have noncontact visits; and spend more than an hour per day outside their cells.[4] Plaintiffs complain further that their inability to participate in rehabilitative and educational programs while in segregation has reduced their ability to earn good conduct time to the point where they are not earning any such credit. They assert that in the past, violators of DOP 864 have lost privileges that even other segregation inmates have. Plaintiffs admit that the grooming policy furthers compelling interests. They assert, however, that the penalties imposed are excessive sanctions and not the least restrictive means, given the fact that they keep their hair clean and none of them has ever used his uncut hair to hide contraband or change his identity.

Plaintiffs offer several alternatives to segregation for inmates who refuse to comply with

---

[3] Madison also states in his affidavit in support of the complaint that in segregation, he is unable to pray in his cell because the noises and activity in the unit disturb his prayer. He does not, however, demonstrate that these noise and distraction problems would not exist to the same extent if he were housed in the general population. Therefore, the court cannot find that he stated a claim that enforcement of DOP 864 causes this alleged burden on his beliefs.

[4] Plaintiffs complain that prison officials also "intensify" the punishment of segregation by double-celling inmates who are confined to the cell for 164 ½ hours per week.

4

DOP 864 for religious reasons. Such inmates could remain in the general population, but be given a "religious exemption" to compliance with DOP 864. This exemption, printed on each inmate's ID card or indicated by bright arm bands or different inmate garb, would be forfeited if officers once found that the inmate had used his hair to violate prison policy. Such inmates could be required to undergo random hair searches and to wear their hair pulled back from their faces anytime they entered common areas for work, school, or visits. Another alternative describes a specific segregation pod designated for religious exemptions to DOP 864 where such inmates would be separated from the general population, but still be eligible to receive all general population privileges (much like protective custody inmates). Plaintiffs also argue that the disciplinary charge for violating DOP 864 for religious reasons should be eliminated and all such disciplinary convictions incurred in the past should be expunged from the record.

Defendants submit the affidavit of VDOC Director Gene Johnson, who describes in detail the penological interests DOP 864 was designed to alleviate: security, staff safety, inmate identification, and inmate health. Johnson presents descriptions of numerous instances where inmates' long hair or beards have caused these specific types of security problems at VDOC prisons in the past. As a prison administrator with nearly forty years of experience, Johnson also offers his professional opinion regarding the manner in which the policy addresses each of these interests, the necessity of uniform enforcement of the policy in the general population, and the specific reasons that make the alternatives suggested by plaintiffs unworkable in the VDOC system. Defendants' evidence indicates that the penalty aspects of DOP 864 have changed somewhat since the policy's inception in 1999. Now, violators of DOP 864 are simply subject to all the same restrictions as are all segregation inmates at the institution where they are housed.

5

Madison is currently classified at security level VI, the highest VDOC security level, and as such, he is assigned to Red Onion State Prison ("ROSP"), a super maximum security institution. He received his level VI rating because of numerous disciplinary infractions. Level VI inmates assigned to ROSP are housed either in segregation/isolation or, if they show positive adjustment, in the two-phase Progressive Housing ("PH") Program. In Phase 2 of PH, inmates may meet in groups, while segregation inmates are not allowed to congregate with other inmates. Otherwise, all level VI inmates at ROSP have the same privileges. Madison remains in segregation both because of his disciplinary record and because of his noncompliance with DOP 864.[5] A ROSP segregation inmate can possess one religious book and one religious necklace, use a prayer rug and/or a religious head covering in his cell, view approved video tapes or audiotapes pertaining to his religious holidays and beliefs, contact the institutional chaplain, write to religious leaders, and practice his beliefs in his cell. Madison may also apply to participate in established religious holidays and is currently receiving the Common Fare Diet in keeping with his religious beliefs.

Sutherland is currently classified as a security level VI inmate, primarily due to the severity of his criminal offense, his life sentence, and his being subject to an immigration detainer. Officials gave Sutherland an "override" and placed him at Sussex I State Prison ("Sussex I"), a level V institution. He is in segregation there because of his noncompliance with DOP 864. He has the same opportunities to practice his religious beliefs that Madison has,

---

[5]Inmates with a lengthy history of disciplinary infractions can be assigned to segregation as a means of control. M. Goad, Operations Officer at Buckingham Correctional Center, states, however, that he believes it is impossible to say for sure whether Madison, Sutherland or Murray would be assigned to segregation if it were not for their noncompliance with the grooming policy.

except that he does not have access to a television; he is allowed to have a Walkman radio. While segregation inmates may not congregate with other inmates, and so may not physically attend classes or group religious programming, they may now have jobs in the pod and may write to request educational services that do not require group meetings.[6]

Murray is currently assigned to Buckingham Correctional Center, a security level III institution, where he is in segregation because of his noncompliance with DOP 864. Murray has also committed disciplinary infractions, however. Murray has the same opportunities to practice his religious beliefs as Sutherland has.

## II. Analysis

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Fed. R. Civ. P. 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). The moving party is not entitled to summary judgment, however, if the parties' dispute over a material fact is "genuine." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A genuine issue of material fact exists if a reasonable jury could return a verdict for the

---

[6]The fact that Sutherland has not yet been granted a job or educational programs does not mean that such privileges are not available to segregation inmates and perhaps, in the future, will be provided to him.

7

nonmoving party. Id. When defendants make a motion for summary judgment, properly supported by affidavits, plaintiffs may not rest on the mere allegations or denials of the pleadings. Fed. R. Civ. P. 56(e). They "must identify affirmative evidence from which a jury could find" in their favor. Anderson, 477 U.S. at 256-57. Summary judgment appropriately lies for the movant only if there can be but one reasonable conclusion drawn from the evidence, against the non-moving party. Id. at 247-48.

The court recently held that enforcement of the current DOP 864 grooming policy provisions against an inmate who kept his hair uncut in keeping with his religious beliefs did not violate that inmate's rights under RLUIPA. Ragland v. Angelone, ___ F. Supp. 2d ___, No. 7:02-cv-00786, 2006 WL 679773 (W.D. Va. March 14 and 16, 2006)[7] (published). Like Sutherland, Madison, and Murray, Plaintiff Ragland is housed in segregation because he continues to refuse to comply with DOP 864. The defendant prison officials did not contest the sincerity of Ragland's religious beliefs that required him not to cut his hair, nor did they contest his assertion that enforcement of DOP 864 against him placed substantial burdens upon his practice of this belief and that he thus stated a prima facie claim under RLUIPA. Id. at *5. In support of the policy, defendants in Ragland offered an affidavit from Gene Johnson, identical to his affidavit offered in this case. The court found that defendants had established that compelling state interests in security, staff safety, inmate identification, and inmate health are furthered by the grooming policy. Id. at *6. The court also found that defendants had

---

[7]The day after issuing the initial memorandum opinion in Ragland, the court issued a supplemental memorandum opinion discussing additional precedent from the United States Court of Appeals for the Fourth Circuit. That supplement is part of the court's published opinion in the case.

8

established a compelling interest in uniform enforcement of the grooming policy in the general population and in segregating all noncompliant inmates. Id. at *7-8. Then, noting the court's continuing obligation under RLUIPA to defer appropriately to the expert opinions of experienced prison administrators in prison policy matters, the court found that creating any religious exemption to segregation restrictions for such inmates would present unacceptable, new or additional security risks. Id. at *8-9. Thus, the court found that DOP 864 in its current form furthers compelling interests by the least restrictive means and that defendants were entitled to summary judgment as a matter of law as to Ragland's claims under RLUIPA. Id. In addition, the court found that defendants were entitled to qualified immunity against any claims for monetary damages for alleged violations of RLUIPA. Id. at *4, citing Jackson v. District of Columbia, 89 F. Supp. 2d 48, 65-69 (D. D.C. 2000), vacated on other grounds, 254 F.3d 262 (D.C. Cir. 2001).

Defendants in this case do not contest plaintiffs' assertions that their sincere religious beliefs require them to wear their hair uncut in defiance of the grooming policy. For purposes of this opinion, the court assumes without deciding that enforcement of the grooming policy against plaintiffs places a substantial burden on their religious practice.[8] For the reasons stated in the

---

[8]Defendants make a strong argument that the grooming policy does not substantially burden plaintiffs' religious practice. Plaintiffs have clearly not been pressured by the policy into foregoing that aspect of their beliefs requiring them to wear their hair uncut. They also do not dispute defendants' evidence of other religious activities available to them in segregation: possession of religious property items, reading religious materials, listening to religious programs, contacting religious leaders or the chaplain, prayer and other religious practices in their cells. Most other effects of segregation could be termed relatively minor inconveniences when compared to the normal constraints of prison life. This comparison is particularly telling in Madison's case, as no inmate at ROSP enjoys extensive privileges. Moreover, as all three inmates have been convicted of disciplinary infractions unrelated to their violations of DOP 864, it is unclear when or if they would qualify under current VDOC regulations for assignment to the general population even if the

Ragland opinions, however, the court concludes that DOP 864 meets RLUIPA's strict scrutiny standard and that defendants in this case are entitled to summary judgment. Plaintiffs fail to show any genuine issue of material fact in dispute. As the court found in Ragland, prison officials have offered sufficient evidence that segregation of inmates who refuse to cut their hair, like Sutherland, Madison, and Murray, is the least restrictive way to control the compelling risks that hair presents. The alternatives and exemptions that plaintiffs suggest, or highly similar ones, the court addressed in the Ragland case.[9] In this case, as in Ragland, the court must defer to defendants' specific expert opinion, corroborated by evidence, that such alternatives are unworkable in light of defendants' strong interest in maintaining uniform enforcement of segregation restrictions.

Plaintiffs primarily complain that segregation status prevents them from congregating

---

grooming policy did not require segregation for noncompliant inmates.

[9]Sutherland and Madison argue that instead of segregating noncompliant inmates, the VDOC could transfer such inmates to other prison systems that do not have grooming policies which violate the inmates' religious beliefs. In Ragland, the court found this alternative to be unworkable, given Gene Johnson's detailed description of the barter system the VDOC uses to accommodate inmates who want or need to be transferred to other prison systems or states and the pre-transfer criteria that inmates must ordinarily meet. Id. at 16-17. In this case, defendants offer additional evidence that the suggested transfer alternative would create new security problems, arising from other inmates' resentment or attempts to deceive officials regarding religious need for transfer. They also provide specific evidence about the additional costs of housing inmates outside the VDOC system in cases where no other prison system wants to trade inmates. RLUIPA provides that a government may have to incur additional costs in order to avoid imposing substantial burdens on individuals' religious practices. § 2000cc-3(c). Congress clearly expressed its intention, however, that courts applying the RLUIPA standard in the prison context should give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter v. Wilkinson, 125 S. Ct. 2113, 2123 (2005) (citations to congressional records omitted, emphasis added). Furthermore, none of the plaintiffs in this case has personally expressed a desire to be transferred out of state in order to wear his hair long without segregation restrictions.

with fellow believers, an important aspect of their religious practice.[10] Defendants' evidence indicates that allowing such gatherings of segregation inmates with long hair would present the same risks as existed before the grooming policy—that inmates would hide contraband in their hair, pass it to each other during the meeting, or use it to injure staff or other inmates, or that inmates in close contact with each other might spread parasites or other hair-related health problems to other inmates. The fact that plaintiffs and others of their faith have never used their hair to violate other prison policies does not eliminate the risks presented by their hair itself that such problems might occur in the future. Allowing religious meetings among segregation inmates would also foster resentment among other inmates in the unit who are not allowed to congregate with others, possibly leading to violence or false religious conversions for ulterior motives. Indeed, as the court found in Ragland, allowing a religious exemption from any of the challenged segregation restrictions would potentially have these effects and create new security risks of the very sort the grooming policy is designed to control. Id. at *8-9.

Madison asserts that existing VDOC regulations provide for different treatment of segregation inmates without fostering animosity from other inmates. He points specifically to the different religious diets that such inmates may request and the regulation allowing an inmate to seek approval from the Faith Review Committee to add a specific religious item to the approved inmate property list for segregation. He is correct that in each of these situations,

---

[10]Sutherland inexplicably states that because of the grooming policy, he cannot practice his faith in any manner. That, of course, is not the case. Sutherland fails to mention the fact that he is allowed to wear his hair long and in dreadlocks in keeping with his religious beliefs and that he is allowed to practice his religion in his cell. Sutherland also complains that he is unable to receive his religious diet, but he does not demonstrate that this inability is caused by enforcement of the grooming policy. As stated, the court earlier dismissed his diet claims from this action.

11

VDOC officials must assess the religious sincerity of the applicant's belief. Neither of these instances, however, involves an exception for only religious inmates that would be equally attractive to any other, nonreligious segregation inmate, such as the exceptions plaintiffs are seeking. Plaintiffs fail to offer substantial evidence demonstrating that the current segregation restrictions from which they seek exception–such as the limitation on out-of-cell activity--are an exaggerated response to potential risks posed by the difficult segregation inmate population as a whole.

With the requisite level of deference to officials' expertise in policy matters, for the reasons stated in Ragland and in this opinion, the court concludes that defendants are entitled to summary judgment as a matter of law as to all plaintiffs' claims for injunctive relief regarding the enforcement of the current VDOC grooming policy. Furthermore, the court also concludes that defendants are entitled to summary judgment on the ground of qualified immunity as to any claims for monetary damages, including claims arising from the harsher penalties allegedly imposed on plaintiffs under earlier versions of the grooming policy. Id. at *4. The court will grant defendants' motion for summary judgment. An appropriate order shall be issued this day.

The Clerk is directed to send certified copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for the defendants.

ENTER: This 20th day of March, 2006.

/s/ James C. Turk
Senior United States District Judge

12

Case 7:02-cv-00477-JCT   Document 116   Filed 03/21/06   Page 12 of 12   Pageid#: 502